(142 App. Div. 83.)

## SCHMIDT v. WEEKS et al.

(Supreme Court, Appellate Division, Third Department.   December 9, 1910.)

1. CHATTEL MORTGAGES (§ 43*)—CONSTRUCTION—BLANK FORM — PROVISIONS NOT ERASED.

   Where parties use the wrong blank in making a chattel mortgage and there are certain recitals in the blank that are not true and are not erased, they will not change the nature of the actual transaction, and the transfer of the note and mortgage after maturity will not change the nature of the obligation.

   [Ed. Note.—For other cases, see Chattel Mortgages, Dec. Dig. § 43.*]

2. CHATTEL MORTGAGES (§ 206*)—TRANSFER OF MORTGAGE—COLLATERAL SECURITY.

   Where a chattel mortgagee assigns the mortgage and indorses the note to his creditor with the agreement that whatever is received upon the note and mortgage shall be the purchase price, and shall be applied upon the mortgagee's indebtedness to the assignee, the note and mortgage are transferred as collateral security for the indebtedness of the mortgagee.

   [Ed. Note.—For other cases, see Chattel Mortgages, Dec. Dig. § 206.*]

3. CHATTEL MORTGAGES (§ 227*) — TRANSFER OF PROPERTY — MORTGAGE AND NOTE—OWNERSHIP OF PROPERTY.

   A partner in a livery business purchased his partner's interest in the business and property, and gave his note secured by chattel mortgage on the property for the purchase price.   After the maturity of the note, the mortgagee assigned it and the mortgage to a bank as security for an indebtedness, and subsequently the mortgagor gave an employé of the bank a bill of sale of the property, and another employé of the bank turned the property over to the mortgagee.   Held, that the bank held the property as additional security for the mortgagee's indebtedness, and any surplus realized by the bank from a sale of the property would have belonged to the mortgagee; the effect of the bill of sale being to transfer to the bank the mortgagor's equity of redemption for the benefit of the mortgagee.

   [Ed. Note.—For other cases, see Chattel Mortgages, Dec. Dig. § 227.*]

4. ESTOPPEL (§ 70*)—FAILURE TO ASSERT TITLE.

   An employé in a livery stable on asking the person in charge for his pay was referred to plaintiff, and, on his asking plaintiff who owned the property in the livery stable, plaintiff gave him to understand that he did not know, and thereupon the employé sued the person in charge of the livery stable and obtained a judgment, levied on the property as the property of such person without any knowledge or information that plaintiff owned or claimed to own the property until after the property had been sold under the execution.   At the time of the sale the person in charge of the livery stable forbade the sale in behalf of the owner, but refused to state who the owner was.   Held, that plaintiff was estopped from thereafter claiming title to the property.

   [Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 183–187; Dec. Dig. § 70.*]

5. CHATTEL MORTGAGES (§ 162*)—EFFECT OF FAILURE TO PAY AT MATURITY.

   After default in the payment of a chattel mortgage, the title of the mortgagee to the mortgaged property becomes absolute by operation of law, and the mortgagor has no further interest in the property except an equity of redemption and the right to maintain an equitable action to that end.

   [Ed. Note.—For other cases, see Chattel Mortgages, Dec. Dig. § 162.*]

   Smith, P. J., dissenting.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from Judgment on Report of Referee.

Action by Christian A. Schmidt against Frank W. Weeks and others. Judgment for plaintiff, and defendants appeal. Reversed and remanded.

Argued before SMITH, P. J., and KELLOGG, COCHRANE, SEWELL, and HOUGHTON, JJ.

E. J. Baldwin, for appellants.

Reynolds, Stanchfield & Collin (Frederick Collin, of counsel), for respondent.

HOUGHTON, J. This action is against the sheriff and his deputies for selling in October, 1901, certain personal property in the possession of John B. Keeler upon an execution duly issued against him in favor of one Marsh. Keeler and one Knickerbocker, as copartners, were carrying on a livery business, and owned the horses, carriages, and property used in connection therewith. Knickerbocker November 15, 1894, purchased Keeler's interest in the business and property, and gave him therefor his note for $8,540, dated that day, payable to Keeler's order 30 days after date, which note was secured by a chattel mortgage on all the property used in the business and some other property. The mortgage was upon a blank form, and at one place it recited that it was given to secure Keeler's indorsement upon that note. It also states that it is given to secure any and all indebtedness from Knickerbocker to Keeler.

The mortgage erroneously recites that Keeler is to indorse the note for the accommodation of Knickerbocker. The note, in fact, was concededly given for the purchase price of Keeler's interest in the livery stable, and the mortgage was given upon the property sold to secure the payment of the note. The mere fact that the parties used the wrong blank in making the mortgage and that there were in it certain recitals that are not true is not to change the nature of the actual transaction. The note and mortgage in Keeler's hands were valid obligations against Knickerbocker, held by Keeler for his own benefit, and their transfer after maturity does not in the least change the nature of the obligations.

The mortgage was promptly filed in the town clerk's office, and on the 18th day of November, 1895, it was refiled by Keeler, he certifying that the whole amount, with interest, was due thereon. Keeler was evidently in straitened circumstances, and was indebted to the Chemung Canal Bank upwards of $20,000, and on or about the 1st day of December, 1895, he assigned the chattel mortgage and indorsed the note to the bank, with the agreement, as he says, that whatever was received upon the note and mortgage should be the purchase price and should be paid to Keeler by applying it upon his indebtedness to the bank. In other words, the note and mortgage were transferred to the bank as collateral security for the indebtedness from Keeler. May 20, 1896, Knickerbocker delivered to the plaintiff, who was in the employ of the bank and acting for it, a bill of sale of the livery property. It was acknowledged before Keeler as notary public, and

Keeler knew beforehand that it was to be executed and had knowledge of its delivery. It does not appear that any understanding or negotiation took place between Knickerbocker and the plaintiff or the bank, but it is evident the bank had no interest in the livery property except as it held the note and mortgage as collateral security, and, when Knickerbocker delivered the bill of sale to the plaintiff for the bank, it simply became additional security, and upon payment of Keeler's indebtedness to the bank, or upon realizing from the mortgaged property the $8,540 and interest, it was the duty of the bank and its agents to turn over to Keeler all the benefits which it or its agents had acquired under the mortgage or on account thereof. If the bank had sold the mortgage property and realized a surplus therefrom, such surplus would be the property of Keeler rather than the bank, because the bank realized the surplus from a collateral security which it received from him.

It is evident the delivery of the bill of sale was more a transaction between Keeler and Knickerbocker than between Knickerbocker and the bank. Knickerbocker's note was not surrendered up, and it does not appear that any consideration moved to him from the plaintiff or the bank. Keeler had an office in the livery stable building, with a door opening into the stable, and, after the bill of sale was delivered to the plaintiff, another employé of the bank went to Keeler, looked over the property with him, and delivered to him the key of the building, telling him to take care of the property until some other arrangement was made. He never agreed to account for its use or to pay therefor. It is not quite clear how far Keeler was running the livery stable, or was in possession of the mortgaged property at the time the bill of sale was made. He is not quite clear in his own mind as to whether he or Knickerbocker was really in possession at the time. It does appear, however, that from that time until the levy and sale under the execution in question, October, 1901, Keeler was actively carrying on the livery business for his own benefit, using the property practically as his own and paying the bank or the plaintiff nothing on account thereof except that, in some cases where certain of the property was sold from time to time or traded by Keeler, the purchase or boot money was paid to the bank and credited on Keeler's indebtedness. Before Keeler assigned the note and mortgage to the bank, they were past due, and the legal title was in Keeler, although Knickerbocker retained possession and had an equity of redemption whereby upon payment of the mortgage and interest he would become reinvested with the title to the property. His transfer of the note and mortgage transferred his interest in the property to be held as security, and, when the plaintiff took the bill of sale from Knickerbocker, it practically extinguished the equity of redemption so far as Knickerbocker was concerned, which was then held by the plaintiff as additional security for the bank on account of the indebtedness which Keeler owed it. The mortgage was never refiled by the bank, and its only claim to the mortgaged property was under the mortgage which Keeler assigned to it and the bill of sale, which extinguished practi-

cally Knickerbocker's interest, and created a situation where Keeler, upon payment of the amount of the note, was the absolute owner of the property.

Marsh, the judgment creditor, was employed by Keeler in the livery stable taking care of the property which was covered by the mortgage, and was sent by Keeler to the bank officers for his pay. They told him to go to Keeler. He returned to Keeler, who referred him to the plaintiff. The plaintiff gave him no satisfaction, and he asked plaintiff who owned the property in the livery stable, and plaintiff gave him to understand that he did not know. Thereupon Marsh sued Keeler, obtained a judgment, and caused the property to be levied upon as the property of Keeler. He had no knowledge or information that plaintiff owned or claimed to own the property until after the sale. At the time of sale Keeler claimed that he was not the owner, and forbade the sale in behalf of the owner, but upon inquiry as to who the owner was he refused to state. Plaintiff was duly informed of the levy, and if Keeler forbade the sale in behalf of the owner, as he claimed, it must be assumed he was acting for the plaintiff, and we therefore have the plaintiff at the time of sale refusing to disclose the fact that he is the owner or claims an interest in the property. If the plaintiff owned the property, he was fairly called upon to disclose his ownership in the interview with Marsh at the time of sale, and it is now too late for him to discover that he is the owner. He knows no more now about his ownership than he did at the time he led Marsh to believe that he had no interest in it. Keeler, the bank, and the plaintiff practically treated the property as that of Keeler; the bank having a lien upon it for the payment of its debt. If it was considered between them that the bank owned the property, there was a studied effort to conceal the fact of such ownership, and no injustice comes from treating the situation as they led Marsh to believe it was. The plaintiff, to avoid the payment of Marsh's bill for services in the care of the property, denied ownership, and now, to save the property asserts title to defeat the bill for services which equitably should be paid by him or from the property. The plaintiff cannot now be heard to say that he owns the property and intentionally deceived Marsh, after having thus put himself in a false position by disclaiming title. McMillan v. Leaman, 101 App. Div. 436, 91 N. Y. Supp. 1055.

Construing the transaction of the giving of the chattel mortgage as we do, that it was not a mortgage to indemnify Keeler for indorsing the note delivered to him by Knickerbocker and of which he himself was the owner, but rather a mortgage given to secure the purchase price which Knickerbocker had agreed to give for the livery, it follows that Knickerbocker had no title which he could transfer to the plaintiff when he gave his bill of sale to him. The note became due December 15, 1894, and the mortgagor defaulted in the payment of the mortgage debt on that day. Keeler was still holder of the mortgage, and by operation of law legal title to the mortgaged property passed to him. Nearly a year after this date, Keeler transferred his interest in the mortgage and the note which it was given to secure to the bank as collateral security for his general indebtedness to it, as

was conceded upon the trial and found by the referee. It was not until May, 1896, and after Keeler's title had ripened by default in payment of the mortgage, that Knickerbocker assumed to transfer the property to the plaintiff. At that time Knickerbocker had no legal title which he could transfer. After default in the payment of a chattel mortgage by operation of law, the title of the mortgagee to the mortgaged property becomes absolute, and the mortgagor has no further interest in the property except an equity of redemption and the right to maintain an equitable action to that end. Casserly v. Witherbee, 119 N. Y. 522, 526, 23 N. E. 1000; Cartier v. Pabst Brewing Co., 112 App. Div. 419, 422, 98 N. Y. Supp. 516; Darrow v. Wendelstadt, 43 App. Div. 426, 60 N. Y. Supp. 174; Stoddard v. Denison, 38 How. Prac. 296.

The attempt to put Keeler in possession of the property in behalf of the plaintiff after the bill of sale from Knickerbocker to him had been delivered did not change the situation. The property was already Keeler's subject to whatever rights the bank obtained by reason of Keeler's transfer of his interest in it or the mortgage which covered it to the bank in the December previous. Keeler in effect was put in possession of his own property, and the plaintiff obtained no interest in it by assuming to put him in possession in his own behalf. Even if it be assumed that Keeler divested himself of all his rights in the property as owner by his assignment of the defaulted mortgage to the bank as collateral security, concerning which there is much doubt, he never pretended to transfer any of his rights to this plaintiff. Whatever rights he divested himself of were in favor of the bank. It was conceded upon the trial that the plaintiff represented the bank, not upon the theory that the bank became owner of the property through transfer from Keeler and that plaintiff was looking after it for the bank, but upon the theory that the plaintiff became owner of it through transfer from Knickerbocker. It is by reason of the transfer from Knickerbocker that the plaintiff claims his right to maintain this action.

The plaintiff does not stand in the position of a defaulting mortgagor retaining possession at the sufferance of the mortgagee, and who therefore as against a stranger might maintain an action for conversion. He was not the mortgagor and he never acquired any legal possession, nor did he have any at the time of the levy of which he now complains. If any one aside from Keeler had any rights in the mortgaged property, it was the Chemung Canal Bank, and not this plaintiff, and any action for interference with it should be brought by the bank, and not by him. The manner of trading the property and all the circumstances connected with the transaction point to an attempt to shield Keeler from execution.

The judgment should be reversed and referee discharged, and a new trial granted, with costs to the appellants to abide the event. All concur, except SMITH, P. J., dissenting.